# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| INTERTEK USA INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 14 CV 6160 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| AMSPEC, LLC, JAMES GRACA, LISA ) | |
| GRACA, MELANIE MCMAHON, ) | |
| MATTHEW REILLY, and MALCOLM ) | |
| VELLA, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION & ORDER

Intertek USA Inc. sued its competitor, AmSpec, LLC; its former employees, Jim Graca, Lisa Graca, and Melanie McMahon; and AmSpec officers Matthew Reilly and Malcolm Vella (collectively, "Defendants"), alleging, among other things, that Defendants misappropriated Intertek's trade secrets. Intertek moves for a preliminary injunction, seeking to enjoin AmSpec from opening a branch office in or around the Chicago metropolitan area as well as injunctive relief against Jim Graca and Melanie McMahon. The court held a preliminary injunction hearing from September 2-5, 2014. For the reasons explained below, Intertek's motion for a preliminary injunction is granted.

## I. FACTS

Intertek is a Louisiana corporation that tests and inspects petroleum products and chemicals. As part of its network of testing labs and offices, Intertek has a Chicago branch located in Romeoville, Illinois. Intertek owns roughly 60% of the market share for petrochemical testing and inspection in Chicago.

Jim Graca, Lisa Graca, and Melanie McMahon are all former employees of Intertek. Jim Graca was the branch manager of Intertek's Romeoville office. His wife, Lisa Graca, was Intertek's administrative assistant for the Midwest region. McMahon was the lab manager for the Romeoville office.

As employees of Intertek, the Gracas and McMahon were required to execute electronically "Employee Confidentiality and Innovation Agreements." The agreements included non-solicitation clauses, which prohibited former employees from attempting to solicit any Intertek employee for one year following their resignation or termination. The agreements also required employees not to disclose Intertek's confidential information and trade secrets, including its financial information, customer lists, and information related to its testing methods. An Intertek employee's access to confidential information was limited to information relevant to that employee's job, and access was password-protected.

AmSpec competes with Intertek in the petrochemical-testing industry. In 2013, AmSpec received an infusion of venture capital, which allowed it to expand into new markets, including Chicago. On September 13, 2013, after Jim Graca had heard that AmSpec was coming to Chicago and had called inquiring about a job, AmSpec's COO, Malcolm Vella, and Vice President, Matt Reilly, met with Graca in the Chicago area to discuss AmSpec's plans to open a lab in Chicago. On September 20, 2013, Reilly e-mailed Graca, saying that he was preparing a "business plan" for AmSpec's entrance into the Chicago market. (Pl.'s Ex. 3.)[1] Reilly told Graca that he "would greatly appreciate any information that [Graca] could give [Reilly]" regarding (1) the "top 20 or so potential clients with estimated potential revenue," (2) the

---

[1] Citations to "Pl.'s Ex." are to exhibits Intertek introduced during the preliminary injunction hearing.

"minimum staffing requirements necessary to handle the anticipated workload," and (3) a "listing of analytical capabilities required to accommodate the regional needs." (*Id.*)

On September 25, 2013, Graca told Reilly that he "ha[d] an Admin, Ops Manager and Coordinator on board" to leave Intertek with Graca for AmSpec. (Pl.'s Ex. 6.)[2] He told Reilly that he was "working on the Business Plan" and asked Reilly whether he would like the plan fitted for Chicago or the entire Midwest region. (*Id.*)

On September 27, 2013, Reilly e-mailed Graca an offer of employment to be AmSpec's Area Manager for the Inland Waterways & Midwest Region. (Pl.'s Ex. 7.) He noted that AmSpec had "not broken ground on a facility [in Chicago] yet" but said that he anticipated AmSpec would be able to do so "in approximately two months." (*Id.*)

On October 3, 2013, Graca downloaded Intertek's 13-month Chicago aging and sales reports by accessing Intertek's "Phoenix" system, which is accessible only to Intertek employees through its intranet. (Pl.'s Ex. 8.) The reports listed Intertek's clients in the Chicago branch and their outstanding balances. (*Id.*) Graca then e-mailed the reports from his Intertek address to his personal e-mail address. (*Id.*) He then placed the e-mail in an e-mail folder labeled "AmSpec."

Also on October 3, 2013, Reilly sent Graca an e-mail with the subject line, "Chicag[o] – Budget Discussion." (Pl.'s Ex. 9.) Reilly attached a form template that he said would be used for presentation of his business plan to AmSpec's owners. (*Id.*) He asked Graca to review the document and to "let [Reilly] know when [Graca] ha[d] some time to discuss," noting that he wished to "get [the business plan] preliminarily wrapped up and passed on prior to the weekend." (*Id.*) The business plan template attached to the e-mail included sections titled "Proposal,"

---

[2] AmSpec argues that Intertek's non-solicitation agreement applied to Intertek employees only after they left Intertek. The court finds this reading overly literal and cramped. At a minimum, Intertek employees bound by the non-solicitation agreement had a fiduciary obligation not to solicit their Intertek co-employees to leave Intertek to go to work for a competitor.

3

"Assets," "Summary," "Financial Projections," "Market Analysis," "Staffing Requirements," and "Capital Expenditure." (*Id.*)

On October 4, 2013, Graca responded to Reilly's e-mail and asked if it would be "possible to try to complete tomorrow." (Pl.'s Ex. 10.) Reilly replied, "No worries… Tomorrow is fine . . . ." (*Id.*)

On October 5, 2013, Graca told Reilly to "add the Enbridge Southern Lights to our capability." (Pl.'s Ex. 11.) Enbridge was an Intertek customer, and "Southern Lights" was a specific testing project that Intertek performed for Enbridge. Graca's e-mail stated, "This will reflect analytical support to more customers than just Enbridge." (*Id.*) He then listed eleven different tests, such as "D5453 Sulfur" and "D6730 DHA." (*Id.*) He also listed four "non-routine methods" that AmSpec could "ship out for." (*Id.*) Graca testified that the e-mail had been prepared by Melanie McMahon.

On October 7, 2013, Jim Graca requested that Lisa Graca send him a copy of the recent profit and loss (P&L) statement for Intertek's Romeoville branch. (Pl.'s Ex. 14.) The P&L statement included information about the quantities of chemicals that Intertek tested, the payroll structure of Intertek's Romeoville branch, and the branch's rent and electricity costs. Graca forwarded the statement to his personal e-mail account and placed it in his AmSpec folder.

On October 11, 2013, Vella wrote Graca, saying "We need to really get things going" because Vella had "a board meeting [at the end of the month]" and wanted to "present everything then." (Pl.'s Ex. 16.) On October 13, 2013, Graca sent Reilly an e-mail titled, "Chicago Capabilities," which listed the methods and instruments that McMahon thought AmSpec should have in its Chicago office. (Pl.'s Ex. 17) The list was later found in Vella's files. The list included dozens of pieces of equipment that McMahon thought AmSpec should have in its new

4

lab, as well as the American Society for Testing and Materials (ASTM) testing methods that AmSpec should use with the equipment. (*Id.*) When Intertek's Vice President for the Central Region, Jeffrey Kaylor, reviewed McMahon's "wish list" at the hearing, he stated that it was "in essence" Intertek's lab in Chicago.

Kaylor testified that several pieces of equipment and methods identified on McMahon's wish list would not have been readily known and used in other labs, including "X-Ray, Sulfur, Lead and Chloride," "Lubricity HFRR," "Filtration Setup," "DHA on LPG," "Sulfur Speciation," and "API Gravity, Density, Relative Density (Specific Gravity) by Hydrometer." He testified that Intertek performed some of these tests for a single Intertek customer in Chicago. He further testified that because the decision to purchase equipment requires a careful weighing of the demand in a market, whether the demand can be satisfied by equipment elsewhere, and the projected profitability of having the equipment on hand, it took Intertek five to ten years to develop the Intertek lab reflected on McMahon's wish list.[3]

After receiving McMahon's wish list from Graca, Reilly and Vella began preparing AmSpec's business plan for the Chicago branch using the same template that Reilly had previously sent Graca. (Pl.'s Ex. 22.) They presented the business plan to AmSpec's board on December 23, 2013. The plan included, among other things, a proposed budget, financial projections, a customer list, a personnel list, and a list of equipment to be included in AmSpec's Chicago lab. According to numerous witnesses whose testimony the court credits, the lab equipment included in the business plan closely mirrored McMahon's wish list.

On November 7, 2013, Lisa Graca e-mailed Jim Graca the most recent P&L statement for

---

[3] While the court credits Kaylor's testimony that Intertek spent a considerable amount of time and effort designing its lab, the court does not believe that a competitor, focused on displacing Intertek and with access to all the customers in the Chicago market, would require anything like this amount of time to build an equivalent laboratory.

all of Intertek's offices in the Inland Waterways. (Pl.'s Ex. 21.) As the branch manager of Intertek's Romeoville office, Jim Graca would not have had access to this information. As the Midwest Regional Administrative Assistant, however, Lisa Graca was a "super user" of the Intertek intranet system and had access to the information. Jim Graca e-mailed the documents that his wife sent him to his personal e-mail account and placed them in his AmSpec folder.

On February 3, 2014, Reilly texted Jim Graca, explaining that he did not respond to Graca's e-mails sent to Reilly's AmSpec address because he "intended to call and suggest that we start communication from your personal emails to mine so as to leave no trace if and when things hit the fan." (Compl. Ex. F.) Reilly then provided Graca with his personal e-mail address.

On February 7, 2014, Graca asked Intertek's head of human resources to send him salary information for the Romeoville office. (Pl.'s Ex. 25.) After he received the information, Graca e-mailed it to his personal e-mail address and placed it in his AmSpec folder. (*Id*.) Graca had access to this information in the course of his work as Romeoville branch manager at Intertek.

On June 16, 2014, Graca sent Reilly and Vella a copy of Intertek's bid for a job in Illinois (the "CDC project"). He suggested that AmSpec bid on the project and that Reilly and Vella make the bid "a priority," as AmSpec would be "operational when services begin." (Pl.'s Ex. 29.)

On July 4, 2014, McMahon e-mailed Reilly and Vella a spreadsheet listing all of Intertek's employees in Romeoville. (Pl.'s Ex. 33.) The list included each employee's name, position, phone number, and e-mail address. (*Id.*) McMahon also indicated on the spreadsheet her comments about each employee and whether AmSpec should be interested in hiring him or her. (*Id.*) She indicated in her e-mail to Reilly and Vella that they could use the list "for [their] interviews next week." (*Id.*)

6

Jim Graca resigned from Intertek on July 3, 2014, and McMahon resigned from Intertek on July 13, 2014. In the next two days, Intertek employees Ryan Rathert, Tim McNeela, and Eric Meisinger also resigned. Intertek fired Lisa Graca that same month. Jim Graca is now AmSpec's regional manager for the Inland Waterways & Midwest Region. McMahon is now the lab manager for AmSpec's Chicago branch.

Intertek filed its complaint against AmSpec, the Gracas, McMahon, Reilly, and Vella on August 11, 2014, alleging five counts: (1) violation of the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065/1, *et seq.*; (2) breach of fiduciary duty; (3) tortious interference with existing and prospective economic advantage; (4) breach of contract; and (5) civil conspiracy. At the same time, Intertek moved for a temporary restraining order and preliminary injunction. The court issued a temporary restraining order on August 15, 2014. The court then held hearings on the motion for a preliminary injunction on September 2-5, 2014, and the TRO has been extended pending this ruling by agreement of the parties and for good cause shown.

## II. ANALYSIS

"To justify a preliminary injunction, the plaintiffs must show that they are likely to succeed on the merits, that they are likely to suffer irreparable harm without the injunction, that the harm they would suffer is greater than the harm that the preliminary injunction would inflict on the defendants, and that the injunction is in the public interest." *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010).

### A. Likelihood of Success

Intertek argues that it has established a likelihood of success on its claim for misappropriation of trade secrets. To prevail on such a claim under the Illinois Trade Secrets Act (Act), a plaintiff must demonstrate that "the information at issue was a trade secret, that it

was misappropriated and that it was used in the defendant's business." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003).

The Act defines a trade secret as:

[I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 Ill. Comp. Stat. 1065/2(d). Illinois courts frequently refer to six common law factors in determining whether a trade secret exists: (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which the information is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort and money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Learning Curve Toys*, 342 F.3d at 722 (citing *Delta Med. Sys. v. Mid-America Med. Sys., Inc.*, 772 N.E.2d 768, 780 (Ill. App. Ct. 2002)).

Here, the court finds that Intertek has established that at least two categories of information are trade secrets under the Act: (1) the financial information contained in Intertek's P&L statements and aging and sales reports that Graca sent to his personal e-mail address and then placed in his AmSpec folder (Pl.'s Exs. 14, 21); and (2) the information contained in McMahon's wish list of equipment and testing capabilities for an AmSpec lab that closely resembled Intertek's lab in Chicago (Pl.'s Ex. 17).

With respect to these two categories of information, there is no serious dispute that Intertek took adequate measures to guard the secrecy of the information. But there is considerable dispute over the extent to which the information is publicly available, the value of the information, the time necessary to develop the information, and how easy or difficult it would be for AmSpec to develop the information independently.

With respect to McMahon's wish list, for example, AmSpec notes that methods on the wish list "are publicly available ASTM test methods which are dictated to the inspection companies by their customers," and that they are "tools of the trade for a chemist such as McMahon." (ECF No. 55, at 9.) But although it may be true that the test methods themselves are publicly available, the precise mix and volume of methods that Intertek uses in Chicago, and the profitability of those methods, are not public knowledge. And although AmSpec may have been able to obtain similar information by communicating with customers in Chicago, that process would have taken time, effort, and expense. The court thus concludes that Intertek has shown that the information contained in McMahon's wish list constitutes trade secrets of Intertek. The court also finds that the information contained in the aging, sales, and P&L reports is a trade secret.[4]

Intertek has also shown that Jim Graca misappropriated its trade secrets by forwarding McMahon's wish list to AmSpec. "A misappropriation of trade secrets occurs when a person acquires or discovers a trade secret by improper means or discloses or uses a trade secret in

---

[4] Intertek also argues that Intertek's personnel information, including the salary information for its Romeoville employees, constitutes a trade secret. (*See* Pl.'s Ex. 25.) But AmSpec presented evidence showing that migration of employees in the petrochemical-testing industry is routine and that employees are willing to share their salary information with competitors in hopes of finding a higher-paying position. Accordingly, the court concludes that although Intertek may have treated the information as confidential, it is not a trade secret.

breach of a duty of confidentiality imposed on him by the nature of his relationship with the owner of the trade secret or reposed in him by the owner in disclosing the information, and the owner of the trade secret is damaged by this improper acquisition, disclosure or use." *Am. Antenna Corp. v. Amperex Elec. Corp.*, 546 N.E.2d 41, 44 (Ill. App. Ct. 1989). Here, Graca had a duty pursuant to his confidentiality agreement not to disclose Intertek's confidential information. He breached that duty by disclosing McMahon's wish list to AmSpec, thereby misappropriating a trade secret of Intertek.[5]

Finally, Intertek has shown, and the court finds, that AmSpec used McMahon's wish list in formulating its business plan and building its Chicago lab. First, the close similarity between the equipment in Intertek's lab and the equipment in AmSpec's lab suggests that Reilly and Vella relied on McMahon's wish list in formulating their business plan and designing their lab. Had AmSpec developed its equipment list independently of the information transmitted by Graca, it could have informed the court precisely how it did so. It did not.

The timing of the e-mails between Reilly and Graca further supports an inference that Reilly was keenly interested in the information Graca could provide, including specifically the "analytical capabilities required to accommodate [AmSpec's] regional needs" (Pl.'s Ex. 3) and AmSpec's expected "capital expenditure[s]" (Pl.'s Ex. 9). Each time Reilly requested such information, Graca complied with Reilly's request in a matter of days. Reilly's insistence that Graca provide him with the requested information in a timely manner further supports the inference that AmSpec intended to use the information that Graca provided.

---

[5] Intertek argues that Graca also misappropriated Intertek's financial information, namely its aging, sales, and P&L reports. But the evidence is inconclusive that this information was ever transmitted to AmSpec. Intertek has a theory that Graca transmitted Intertek's financial information to Reilly via a thumb drive, but no evidence supports this theory. Nor has this financial information shown up on Reilly's or Vella's computers.

AmSpec had an opportunity to rebut these inferences at the preliminary injunction hearing but failed to so. When Vella took the stand, Intertek's counsel asked him to explain the e-mails between Reilly and Graca. Vella first told counsel that he would need to ask Reilly that question. When counsel again pressed Vella for an explanation, he testified that he believed Reilly e-mailed Graca simply to keep Graca interested in joining AmSpec. The court does not find this explanation to be credible. Furthermore, Reilly had an opportunity to take the stand and explain for himself why he sent the e-mails, but he did not do so, and the court infers from his silence that he would not have testified favorably for Defendants. Accordingly, the court concludes that Intertek used McMahon's wish list in in formulating its business plan and building its Chicago lab.[6]

For these reasons, the court finds that Intertek has established a likelihood of success on the merits of its claim for misappropriation of trade secrets.

## B. Irreparable Harm to Intertek/Balance of Harms

"There is a presumption of irreparable harm to the plaintiff in cases of trade secret misappropriation . . . ." *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 700 (N.D. Ill. 2004). "The defendants may rebut this presumption by demonstrating that plaintiff will not suffer any harm if the injunction is not granted." *Id.*

It is not difficult to see why Intertek would suffer irreparable injury were AmSpec allowed to open its lab sooner than if it had not misappropriated Intertek's trade secrets. When the AmSpec office opens, AmSpec will begin to compete with Intertek, potentially drawing

---

[6] Because the court finds that Defendants actually used Intertek's trade secrets, it does not address Intertek's alternative argument that even if there were no actual use of Intertek's trade secrets, injunctive relief is appropriate because such use is "inevitable." *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995). Further, the court finds the evidence of actual use in this case stronger than the evidence of future inevitable use.

customers and employees away from Intertek. Such harms are difficult to quantify, which is why irreparable injury is presumed. It is appropriate in such cases to award equitable relief "to eliminate the unfair advantage that defendants' gained by using plaintiff's trade secret information." *Chemetall GMBh v. ZR Energy, Inc.*, 138 F. Supp. 2d 1079, 1088 (N.D. Ill. 2001).

Of course, AmSpec and its employees will also suffer a significant injury. While some AmSpec employees may be able to continue their jobs elsewhere, granting Intertek the full injunctive relief that it seeks will likely render some individuals unemployed for a significant period of time. And while the opening of the Chicago office has already been delayed for approximately six months for reasons unrelated to the present lawsuit, the court understands that AmSpec is ready to open its Chicago office now and wants to do so. Although the court finds that the balance of harms ultimately tips in favor of Intertek, the court is mindful of the serious harms facing AmSpec in crafting an appropriate remedy.

**C. Public Interest**

As the court acknowledged in its order addressing the motion for a temporary restraining order, public interest considerations favor both sides in this case. On the one hand, the public interest supports encouraging invention and innovation and protecting trade secrets. But there is also a public interest in free and open competition. Although the court finds that the balance of these interests favors granting an injunction, the court takes the public interest in free and open competition into account in fashioning appropriate equitable relief.

**D. Remedy**

Intertek asks the court to enjoin (1) Jim Graca and McMahon from working for AmSpec until trial; (2) Defendants from using Intertek's trade secrets; (3) AmSpec from soliciting Intertek employees in Chicago; and (4) AmSpec from opening its office in Chicago.

Before discussing each of these four requests, the court briefly addresses AmSpec's argument that the court should deny equitable relief because Intertek allegedly hacked into Jim Graca's iCloud account in violation of the Stored Communications Act, the Computer Fraud and Abuse Act, and Graca's common law right to be free from intrusion upon seclusion. AmSpec argues that Intertek has "unclean hands" because of these actions and that the court, sitting in equity, should consider Intertek's alleged misconduct and deny equitable relief.

Without expressing a view on the merits of any claims that Graca may have against Intertek, the court rejects AmSpec's argument for the simple reason that "the clean hands doctrine only applies when there is a direct nexus between the bad conduct and the activities sought to be enjoined." *Shondel v. McDermott*, 775 F.2d 859, 869 (7th Cir. 1985). For example, in one of the cases AmSpec relies on to support its theory, the court found that a ticket scalper's "unclean hands" precluded him from obtaining a preliminary injunction against another ticket seller. *Big Time Worldwide Concert & Sport Club at Town Ctr., LLC. v. Marriott Int'l, Inc.*, 236 F. Supp. 2d 791, 808 (E.D. Mich. 2003). The scalper had argued that he was a holder of a senior trademark and that the other seller was using a junior mark that would likely cause confusion. *Id.* at 798. The court held that it was hypocritical for the scalper to rely on the laws governing the permissible selling of tickets when it benefitted him but to ignore such laws when they did not benefit him.

Here, by contrast, there is no "direct nexus" between the alleged bad conduct (hacking into Graca's iCloud account) and the activities sought to be enjoined (opening of a petrochemical testing lab). AmSpec does not argue that Intertek has itself engaged in trade secret misappropriation. The computer hacking issue and the trade secret misappropriation issue are

governed by distinct bodies of law that provide their own separate remedies for misconduct. Accordingly, the court finds the doctrine of unclean hands to be inapplicable.

Turning to the relief sought by Intertek, the court finds that enjoining AmSpec from opening its Chicago lab for some period of time is necessary to eliminate the unfair advantage that AmSpec gained by using Intertek's trade secrets. Intertek requests that the court enjoin AmSpec from opening its Chicago office for 24 months. The court finds this requested relief to be overbroad for several reasons.

First, AmSpec introduced evidence that it already had plans to expand into the Chicago market before Graca approached AmSpec about switching companies. AmSpec had hired a marketing representative, Amanda Congoran, who communicated with potential customers about which tests those customers wanted AmSpec to perform.

Second, it is significant that the Gracas and McMahon never signed non-compete agreements with Intertek. Had AmSpec solicited Intertek's employees properly, nothing would have prevented the Gracas and McMahon from using their general knowledge acquired while on the job at Intertek from helping AmSpec build its lab. Once employed by AmSpec, McMahon could have used her years of experience running Intertek's lab to guide AmSpec in equipping a comparable laboratory. Her knowledge and experience, coupled with Congoran's customer relationships, would have expedited AmSpec's efforts considerably. Of course, neither McMahon's wish list, nor Congoran's customer relationships, would have guaranteed that AmSpec would have won the business to justify the laboratory expenditures, which, according to Kaylor, was the key issue in deciding what equipment to acquire. But it is implausible that it would have taken AmSpec the same amount of time that it took Intertek to develop Intertek's Chicago lab, even had AmSpec never misappropriated Intertek's trade secrets.

Third, there is a strong public interest in increased competition. AmSpec introduced evidence that it has customers who are anxious to use its services in Chicago, and the court must consider the effect that an order barring AmSpec from opening would have on such innocent third parties.

Fourth, and finally, enjoining AmSpec from opening its Chicago-area office is likely to injure many individuals expecting or hoping to work for AmSpec. Many of these individuals are likely innocent of any wrongdoing, and the potential impact on them if they are denied a livelihood for any period of time is likely to be severe.

Taking all this into account, and coupled with the fact that the court's temporary restraining order has already enjoined AmSpec from opening its lab for approximately one month, the court finds that barring AmSpec from opening its Chicago branch for two additional months is a sufficient remedy.

Having granted Intertek's request that the court enjoin AmSpec from opening its Chicago office within the next two months, the court finds many of the other aspects of Intertek's requested relief to be unnecessary. The court will not enjoin the individual defendants from working for AmSpec for any period of time. The purpose of a preliminary injunction is not to punish, and enjoining the individual defendants would only be appropriate if the court thought that doing so was necessary to further eliminate AmSpec's unfair advantage. Having observed the individual defendants' testimony, the court is confident that they have learned their lesson and will not further disclose Intertek's trade secrets. And more significantly, although the court urged Intertek to present evidence of the harm it anticipated going forward if Jim Graca and Melanie McMahon were allowed to work for AmSpec, Intertek presented nothing more than its

argument that because Graca and McMahon have been disloyal to Intertek, the court should infer that they cannot be trusted to obey court orders in the future. The court finds this argument unduly speculative and ultimately unconvincing. The court also believes that sufficient steps have been taken over the course of this litigation to ensure that any Intertek trade secrets that the individual defendants possess will be removed from their possession. If Intertek believes there are additional steps which should be taken, it should so inform the court.

The court also finds that enjoining AmSpec from soliciting Intertek employees in Chicago is unwarranted. Such an injunction would severely limit Intertek's employees from freely choosing to leave Intertek, and the court sees no reason to impose such a condition when it is already enjoining AmSpec from opening its lab.

The court orders AmSpec to pay the salaries of the Gracas and McMahon during the injunctive period. This will mitigate some of the injury to the individual defendants and is appropriate in light of AmSpec's own role in encouraging the individual defendants to disclose Intertek's trade secrets.

Finally, AmSpec does not oppose Intertek's requests that Defendants be barred from using Intertek's trade secrets until trial, and so Intertek's motion is granted insofar as it requests this relief, except that AmSpec may open its Chicago lab after the two-month injunctive period has expired. Additionally, AmSpec does not oppose Intertek's requests that the Gracas and McMahon refrain from soliciting AmSpec employees until trial or that AmSpec refrain from bidding on the CDC project. Intertek's motion is granted insofar as it requests this relief.

## III. CONCLUSION

For the foregoing reasons, Intertek's motion for a preliminary injunction is granted. Intertek is entitled to an injunction barring AmSpec from opening its Chicago-area office for a period of two months, as well as the other relief described above. A status hearing is set for September 12, 2014, at 9:30 a.m. Intertek is directed to present a proposed order for the court's consideration at the status hearing. The parties are further directed to prepare to present their positions on an appropriate bond. The temporary restraining order remains in effect pending the September 12 hearing.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: September 11, 2014